UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
AT COVINGTON

CIVIL ACTION NO. 12-51-DLB-CJS

ESTATE of CHRISTOPHER MINK, deceased,                                       PLAINTIFF
by and through its co-personal administrators
HOLLY ESTES and CHRISTOPHER FERGUSON


vs.                         **MEMORANDUM OPINION AND ORDER**


GCM, LLC, et al.                                                           DEFENDANTS

*******************

Defendant GCM, LLC moves for summary judgment on Carmeuse Lime & Stone's cross-claim for indemnification, arguing that the parties' contract does not require GCM to indemnify Carmeuse for costs incurred in defending the underlying general maritime law action because Carmeuse's negligence was the sole cause of GCM employee Christopher Mink's death. The Court has original jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and § 1333.

I.     **Factual and Procedural Background**

On Saturday, December 17, 2011, GCM, LLC's (hereinafter "GCM") towboat, the M/V Anna C (hereinafter "Anna C"), was scheduled to tow a barge to Carmeuse Lime and Stone's (hereinafter "Carmeuse") Black River Dock, where it would be loaded with lime and stone product bound for the Zimmer power plant. (Doc. # 111-5 at 14-16, 40-42). GCM assigned Captain William Terrell (hereinafter "Captain Terrell") and Richard Littlejohn (hereinafter "Littlejohn") to work aboard the Anna C that day. (*Id.*). GCM also called in

1

employee Christopher Mink (hereinafter "Mink") to work as a replacement deckhand. (*Id.*).

On that date deckhands Littlejohn and Mink attached cables and winches to the barge covers, which Carmeuse barge load operator Pamela Adams (hereinafter "Adams") opened using barge load controls. (Doc. # 111-1 at 38-42 and Doc. # 111-5 at 56-57). Adams, who was operating the controls for the first time without supervision, waited until loading was complete and then closed the barge covers. (Doc. # 111-1 at 28-30). Adams had been trained to wait for the deckhands to unhook the cables and give the all clear signal via radio before she resumed operating the load controls. (*Id.* at 33, 49-53). However, as Mink attempted to unhook the cable, it went taut and pinned him against the coaming of the barge, causing severe injuries that ultimately resulted in his death. (*Id.*).

Based on the record, it is unclear what caused the drop-down cable go taut. In the aftermath of the accident, Adams signed a written statement, at Carmeuse's request, indicating that she had heard Littlejohn tell her to raise the drop-down cable. (Doc. # 111-6). When Adams was deposed approximately one year later, she had difficulty recalling the details of the accident due to the ensuing chaos and could not confidently say that the signed statement was accurate. (Doc. # 111-1 at 9-12). However, she refused to accept any responsibility for Mink's death. (*Id.*).

Neither Captain Terrell nor Littlejohn saw Adams raise the drop down-cable. (Doc. # 111-7 at 88-90, 94, 96, 109-10; Doc. # 111-5 at 224-25). Captain Terrell speculated that Adams caused the accident by raising the drop down cable without waiting for Littlejohn's signal, but he was unable to offer more concrete information because he was otherwise occupied at the time of the accident. (Doc. # 111-7 at 88-90, 94, 96, 109-10). Littlejohn was also engaged in other duties at the time of the accident, so he came on the scene after

2

Mink had been pinned to the barge coaming. (Doc. # 111-5 at 75-78 and 172-73). He felt that Mink could not have become pinned unless he stepped into the bight of the line, rather than approaching it away from the direction of the pull. (*Id.*). When asked about his radio communications with Adams, Littlejohn stated that he could not recall telling her to raise the drop down cable. (Doc. # 111-5 at 224-25).

Although Christopher Mink was one of GCM's regular employees, and had worked at the Black River Dock on a few occasions, he usually worked at the Silver Grove Dock. (*Id.* at 46-50 and 68-70). On the day of the accident, he was filling in for one of the regular deckhands assigned to the Black River Dock. (*Id.*). Captain Terrell admitted that extra precautions should be taken in briefing and supervising deckhands with limited experience at a given facility. (*Id.*). Mink occasionally decked for Captain Terrell at the McGinnis and Silver Grove docks, but Captain Terrell could not recall what duties Mink regularly performed there. (*Id.* at 182-84). Captain Terrell also failed to find out whether Mink was familiar with the Black River Dock. (*Id.*).

Littlejohn explained that working in close proximity to large cables and wires was a common hazard that river deckhands encounter. (Doc. # 111-5 at 164-66). He felt it was common knowledge among deckhands that one must never step into the bight of a line because even slack cables can become taut without warning. (*Id.*). Such information could even be found in the deckhand manual. (*Id.*). Littlejohn also acknowledged that Mink could not have been caught in the pinch point if he had followed protocol and approached the anchor shackle away from the direction of the pull. (*Id.* at 169). Although Littlejohn did go through a safety briefing with Mink before approaching the barge, at which time they discussed which tasks each of them would perform, he did not specifically tell Mink where

3

he should stand when unshackling the pull cable because "[e]verybody knows to stand out of the pinch point and that's where he wound up." (*Id.* at 75-78).

All dealings between GCM and Carmeuse are governed by a Harbor Boat Service Agreement (hereinafter "Agreement"). (Doc. # 102-2 at 1). The Article pertaining to insurance and indemnification provides, in pertinent part, as follows:

> GCM shall observe all applicable federal, state, and local laws and regulations and orders issued thereunder and agrees to and does hereby indemnify, save harmless, protect and defend Carmeuse from and against any and all suits, legal proceedings, causes of actions, claims, demands, penalties, fines, liabilities, damage, costs and expenses (including all costs of legal proceedings and attorney's fees), for bodily injury, including death, resulting therefrom, destruction or damage to any property, contamination of or adverse effects on the environment, any violation of federal, state or local laws, regulations or orders or claims of Carmeuse or GCM's employees or any other person caused by any act or omission of GCM, its agents, employees, servants, subcontractors, vendors, or invitees in the performance of its services hereunder.

(*Id.* at 12-13).

On February 10, 2012, Mink's co-executors, Holly Estes and Christopher Ferguson, filed this action in the U.S. District Court for the Eastern District of Kentucky. (Doc. # 1). The original Complaint brings Jones Act and unseaworthiness claims against GCM, LLC and its affiliates. (*Id.*). The Amended Complaint adds a general maritime claim for negligence against Carmeuse, which prompted the company to demand indemnification from GCM pursuant to the Agreement. (Docs. # 27 and 102-3). When GCM declined to provide the requested funds, Carmeuse filed this cross-claim, claiming that the accident arose from the acts or omissions of GCM and its employees in the performance of contract services for them, and therefore falls under the Agreement's indemnity provisions. (Docs. # 33 and 102-4).

4

**II.      Analysis**

   *1.     Applicable Standard*

Summary judgment is appropriate when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). If there is a dispute over facts that might affect the outcome of the case under governing law, then entry of summary judgment is precluded. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party has the ultimate burden of persuading the court that there are no disputed material facts and that he is entitled to judgment as a matter of law. *Id.* Once a party files a properly supported motion for summary judgment by either affirmatively negating an essential element of the non-moving party's claim or establishing an affirmative defense, "the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 250.

   *2.     Examining the Agreement*

GCM argues that this cross-claim can be resolved simply by examining the indemnification provision of the Harbor Boat Service Agreement, which governs GCM's transactions with Carmeuse. According to GCM, the Agreement's plain language cannot be read as requiring GCM to indemnify Carmeuse for costs incurred in defending the underlying action. Rather than raising any contract interpretation argument of its own, Carmeuse focuses on the parties' disagreement as to the cause of the accident. Specifically, Carmeuse argues that, because each party believes that the other party's acts or omissions caused Christopher Mink's death, there exists a genuine issue of material fact that precludes a grant of summary judgment. Therefore, this Court must consider, as a

threshold issue, whether or not a finding of fact as to causation is a necessary predicate to determining the parties' rights and obligations under the Agreement's indemnification clause.

The parties do not dispute that the Agreement, which pertains to barge shifting, placement, pumping and tending, is maritime in nature. (Docs. # 102-1 at 6; 105 at 16; and 102-2 at 8). Accordingly, this Court will apply admiralty principles to its interpretation of the Agreement. *Porche v. Gulf Mississippi Marine Corp.*, 390 F. Supp. 624, 627 (E.D.La. 1975). Construction of a maritime contract is a matter of law for the courts. *Id.*; *Weathersby v. Concoco Oil Co.*, 752 F.2d 953, 955-56 (5th Cir. 1984). The contract should be read as a whole and its words given their plain meaning. *Weathersby*, 752 F.2d at 955-56. A court should not look beyond the contract's written language unless the disputed provision is ambiguous. *Corbitt v. Diamond M Drilling Co.*, 654 F.2d 329, 332-33 (5th Cir. 1981).

When the parties' contractual dispute centers on an indemnity provision, as GCM believes to be the case here, ease of interpretation is inversely related to the number of parties at fault. *Porche*, 390 F. Supp. at 627. If one party is at fault and the other is free of fault, "the indemnity obligation is relatively easy to interpret and the express clause may, indeed, add little to the principles of implied indemnity." *Id.* However, parties often draft clauses that either create reciprocal indemnity obligations or require one party to indemnify the other even though both were partially at fault. *Weathersby*, 752 F.2d at 956. In such situations, a court should endeavor to "to construe an indemnity clause to cover all losses 'which reasonably appear to have been within the parties' contemplation." *Corbitt*, 654 F.2d at 333.

6

In both sole and joint fault situations, maritime law goes so far as to recognize the validity of contract clauses that provide for one party to be indemnified for the consequences of its own negligence. *Porche*, 390 F. Supp. at 628. According to the *Batson-Cook* rule, a contract need not contain talismanic words to shift liability, but "there must be something to reflect that intention either in the contract language or the surrounding circumstances ('in the realities of the situation from the standpoint of the parties at the time the contract was made')." *Id.* Even if a contract clause imposes relatively broad indemnification obligations on one party, courts will not recognize such an extraordinary obligation as indemnifying the other party for its own negligence absent an explicit expression of intent to do so. *Id.*

With these principles in mind, the Court turns to its examination of Article IX of the Agreement, which provides as follows:

> GCM shall observe all applicable federal, state, and local laws and regulations and orders issued thereunder and agrees to and does hereby indemnify, save harmless, protect and defend Carmeuse from and against any and all suits, legal proceedings, causes of actions, claims, demands, penalties, fines, liabilities, damage, costs and expenses (including all costs of legal proceedings and attorney's fees), for bodily injury, including death, resulting therefrom, destruction or damage to any property, contamination of or adverse effects on the environment, any violation of federal, state or local laws, regulations or orders or claims of Carmeuse or GCM's employees or any other person caused by any act or omission of GCM, its agents, employees, servants, subcontractors, vendors, or invitees in the performance of its services hereunder.

(Doc. # 102-2 at 12).

The plain language indicates that a causal connection between GCM's actions or omissions and the plaintiff's injury is necessary to trigger its indemnification obligations under the Agreement. Since GCM is only required to indemnify Carmeuse for losses it

7

causes, it is critical to understand who or what caused this accident. However, the parties offer very different explanations as to the cause of the accident. GCM believes that Carmeuse barge load operator Pamela Adams was negligent in raising the drop down cable without hearing the all clear signal, causing the cable to go taut and pin Mink as he was attempting to unhook it from the barge cover. GCM then relies on *Porche v. Gulf Mississippi Marine Corp.* to argue that it has no duty to indemnify Carmeuse because Carmeuse was the sole negligent party. 390 F. Supp. 624 (E.D. La. 1975). In *Porche*, the court refused to interpret a contract as requiring a non-negligent party to indemnify a negligent party because the contract "contain[ed] no express language requiring Allen to indemnify Fluor for liability arising out of Fluor's own negligence." *Id.* at 630. However, GCM is premature in analogizing this case to *Porche* because in that case the underlying Jones Act claim had been adjudicated, and one of the parties to the contract found to be negligent, before the Court addressed the indemnification issue.

Carmeuse does not concede that Pamela Adams was negligent in performing her duties as barge load operator. However, even allowing for some negligence on her part, Carmeuse believes that GCM also contributed to the accident because it failed to adequately train and supervise Mink. Carmeuse argues that GCM's alleged failure to train and supervise constitutes an act or omission that caused the accident, and is therefore sufficient to invoke GCM's indemnification obligations under the Agreement.

The record is rife with conflicting explanations and speculation regarding the cause of the accident. GCM repeatedly characterizes that Pamela Adams was negligent because she "had sole control over the cable and pulley system used to open and close the barge covers." (Doc. # 102-1 at 11). While the record demonstrates that Adams was operating

8

the barge load controls on the day of the accident, it is unclear whether or not she raised the drop-down cable. Adams' statement, written and signed in the aftermath of the accident, indicates that she did raise the drop-down cable but only after hearing the all clear signal via radio. When deposed one year later, she was unable to recall the circumstances surrounding the accident but denied any responsibility for Mink's death. Although both Captain Terrell and Littlejohn speculated that Adams must have raised the drop cable, neither saw nor heard her do so. Both men were occupied with other tasks at the time of the accident, so they did not see how Mink became pinned to the barge coaming. Therefore, there is no conclusive evidence that Pamela Adams was the sole negligent party that caused the accident.

There is also deposition testimony suggesting that Captain Terrell and Littlejohn failed to inquire into Mink's knowledge and experience, despite the fact that he was serving as a replacement deckhand on this occasion, and did not adequately supervise him as he performed his duties. However, Mink had considerable experience working as a deckhand at other docks and would likely have been familiar with basic safety protocols. The record suggests that it is within a deckhand's common knowledge to avoid pinch points at all costs, because a cable may suddenly comer under strain for a variety of reasons and injure them. However, Mink was standing in such a pinch point when the drop-down cable went taut and pinned him against the barge coaming. At this juncture, the evidence is not conclusive as to whether GCM's acts or omissions caused the accident.

After examining the Agreement, the Court fails to see how the parties' rights and obligations can be determined simply by looking to the indemnification provision. The Agreement conditions GCM's duty to indemnify on a causal connection between its acts

9

or omissions and the plaintiff's injury, and therefore impliedly relieves GCM of this obligation for losses it did not cause. Accordingly, the cause of the accident must be determined before the Court can decide whether this accident invokes GCM's duty to indemnify. However, the parties to this cross-claim vigorously dispute the cause of the accident, each pointing their finger at the other, and the record thus far provides an incomplete picture of what happened on the day of the accident. Under these circumstances, the Court believes that a factual determination as to causation must precede any determination of indemnity obligations under this Agreement.

Having determined that a factual finding regarding causation is a necessary predicate to determining the parties' rights and obligations under the Agreement, the Court must now consider whether such a factual finding may be made in the underlying cause of action.

### 3. *Claims at Issue*

Plaintiffs' suit against GCM consists of a claim under the Jones Act, which creates a negligence cause of action for ship personnel, as well as a claim for unseaworthiness, which allows recovery for breach of a shipowner's duty to provide a vessel reasonably fit for its intended purpose. *See* 46 U.S.C. § 30104; *Gabourel v. Bouchard Transp. Co., Inc.*, 901 F. Supp. 142, 144 (S.D.N.Y. 1995)(explaining the purpose of the Jones Act); *Ribitzki v. Canmar Reading & Bates, Ltd. Partnership*, 111 F. 3d 658, 664 (9th Cir. 1997)(describing the duty of seaworthiness). Both claims require proof of a causal connection between the alleged breach of duty and the plaintiff's injury. *See Rannals v. Diamond Jo Casino*, 265 F.3d 442, 447 (6th Cir. 2001)(noting that, once a plaintiff proves that his employer was negligent, he need only show that the employer's negligence was the cause, in whole or

10

in part, of his injuries); *Puamier v. Barge BT 1793,* 395 F. Supp. 1019, 1031 n. 4 (E.D. Va. 1974)(stating that, in order to recover for breach of the duty of unseaworthiness, a plaintiff must establish that the warranty of seaworthiness extended to him and his duties, that his injury was caused by a piece of the ship's equipment or an appurtenant appliance, that the equipment used was not reasonably fit for its intended use and that the unseaworthy condition proximately caused his injuries).  Since causation is an element of both claims, adjudication of the underlying cause of action will determine whether or not GCM's actions or omissions caused the accident in whole or in part.

Recognizing GCM's assertion that a Carmeuse employee's negligence caused the accident, the Court will also note that the Plaintiff has brought a negligence claim under general maritime law against Carmeuse.  Virtually anyone who suffers injury or loss in an admiralty setting may invoke negligence under general maritime law.  *Evans v. Nantucket Community Sailing, Inc.*, 582 F. Supp. 2d 121, 137 (D. Mass. 2008).  Since the law of negligence applied on the high seas is akin to the law of negligence on land, a plaintiff must "demonstrate that there was a duty owed by the defendant to the plaintiff, breach of that duty, injury sustained by the plaintiff, and a causal connection between the defendant's conduct and the plaintiff's injury." *Reynolds v. Bar Harbor Whale Watch Co.*, No. Civ. 00-102-B-H, 2001 WL 26205 at *3 (D. Me. Jan. 9, 2011).  Since causation is an element of negligence under general maritime law, adjudication of this claim will determine whether Carmeuse was negligent, as GCM alleges, and if so, whether its negligence caused the accident.

Given the substantial impact that adjudication of the underlying claims would have on the parties' indemnification obligations, the Court believes it is necessary to deny GCM's

11

summary judgment motion at this juncture. Other courts faced with evaluating a summary judgment motion on a cross-claim before resolution of the underlying cause of action have also found it appropriate to deny the motion and await adjudication of the underlying cause of action. *See Laughlin v. Falcon Operators, Inc.*, Nos. Civ. A. 00-1484, Civ. A. 00-2067, Civ. A. 00-2102, Civ. A. 00-2346, 2002 WL 31740726 at *5 (E.D. La. Dec. 4, 2002) (finding it premature to consider on summary judgment Stone's indemnity claims against Chet Morrison because factual questions remained in the case regarding the cause of injuries of several parties); *A/S J. Ludwig Mowinckles Rederi v. Tidewater Const. Co.*, 559 F.2d 928, 932 (4th Cir. 1977) (finding that a ruling on indemnification presented to the district court was premature because there had not been a determination of liability or a settlement in the underlying action and it was impossible to know what the outcome of those actions would be); *Daughdrill v. Ocean Drilling and Exploration Co.*, 702 F. Supp. 1267, 1270 (E.D.La. Dec. 30, 1988)(noting that the court denied a motion for summary judgment on the indemnity issue prior to trial because there were genuine questions of material fact in dispute, specifically whether a causal link or relational basis existed between the injury and the operational functions of Trico).

In the cross-claim currently before the Court, both parties allege that the other acted or failed to act in a way that caused Mink's death. GCM ignores the discrepancies in Pamela Adams' statements and casts her as the negligent party that caused the accident, glossing over all insinuations that they may have played a role in the accident. Carmeuse in turn is quick to label GCM as the cause of the accident, arguing that GCM failed in its training efforts. Given the parties' speculations and the conflicting evidence in the record, this dispute as to causation cannot be resolved simply by interpreting the parties'

12

Agreement. The Court cannot determine whether or not it is appropriate for GCM to indemnify Carmeuse for costs incurred in defending the underlying action until these disputed factual questions have been resolved at trial.

### III. Conclusion

For the reasons stated above,

**IT IS ORDERED** that Cross-Defendant GCM's Motion for Summary Judgment (Doc. # 102) is **denied**.

**IT IS FURTHER ORDERED** that Carmeuse's Motion for Oral Argument on GCM's Motion (Doc. # 106) is **denied as moot**.

This 27th day of November, 2013.



Signed By:
*David L. Bunning*
United States District Judge

G:\DATA\Opinions\Covington\2012\12-51 MOO Denying Cross-D's MSJ.wpd